IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| FRANCIS J. FARINA | : | CIVIL ACTION |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| NOKIA, ET AL. | : | NO.  06-724 |

## MEMORANDUM

**Padova, J.**                                                          **September 2, 2008**

This is a putative class action brought by Plaintiff Francis Farina and all others similarly

situated against manufacturers, suppliers, vendors, and lessors of wireless handheld telephones ("cell

phones"), those who provide wireless services for such devices, and two trade associations who

represented that such devices were safe to use.  Farina alleges:  (1) Defendants participated in a civil

conspiracy to market cell phones while suppressing knowledge of the adverse biological effects and

health risks from radio frequency ("RF") emissions resulting from their use; (2) breach of implied

warranties; (3) breach of express warranty; (4) violation of the Magnuson-Moss Warranty

Improvement Act, 15 U.S.C. §§ 2301-2312;  and (5) violation of the Unfair Trade Practices and

Consumer Protection Law, 73 Pa. Cons. Stat. Ann. §§ 201-2(xxi).  Presently pending are motions

by all Defendants arguing that the state law claims contained in Farina's Third Amended Complaint

("TAC") are preempted by federal law and they fail to state claims upon which relief may be granted

under state law.[1]  Additionally, Defendant Cellular One moves to dismiss the TAC for lack of *in*

---

[1]Although this case has been pending for some seven years, the matter is still at the pleadings
stage.  Only the LG Defendants have answered the TAC.  Their Motion, thus, is styled as one for
judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c).  The other Motions are styled as
dismissal motions under Rule 12(b)(6).

All parties appended matters outside of the pleadings to their respective Motions, Responses
and Replies.  Under Rule 12(d), when matters outside of the pleadings and the public record are
presented on 12(b)(6) and 12(c) motions, the motions are to be treated as summary judgment motions
under Rule 56 and all parties "must be given a reasonable opportunity to present all the material that

*personam* jurisdiction.  For the following reasons, we grant the Motion to Dismiss of Cellular One. We also grant the Defendants' Motions based on federal preemption and, accordingly, do not reach their other Motions.

## I.     PROCEDURAL HISTORY

Farina commenced this action on April 19, 2001 in state court and seven years of complex proceedings have followed.  The case was first removed to federal court on May 18, 2001, based on federal question jurisdiction, see 28 U.S.C. § 1331.  A companion case, Naquin v. Nokia, was also removed to federal court by one of its defendants on the basis of complete diversity.  See 28 U.S.C. § 1332.  On October 31, 2001, by Order of the Judicial Panel on Multi-District Litigation, this case, Naquin, and three other class actions were transferred to Judge Catherine Blake of the United States District Court for the District of Maryland for consolidated pretrial proceedings.  See In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig., 170 F. Supp. 2d 1356 (J.P.M.L. 2001).  The Farina and Naquin plaintiffs then filed motions to remand, which Judge Blake denied.  In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig., 216 F. Supp. 2d 474, 491-93 (D. Md. 2002). Subsequently, Judge Blake granted motions to dismiss all of the consolidated cases based on federal preemption grounds.  In re Wireless Tel. Radio Frequency Emissions Prods. Liab. Litig., 248 F. Supp. 2d 452 (D. Md. 2003).

_____

is pertinent to the motion." Fed. R. Civ. P. 12(d).  By Order of July 21, 2008, we notified the parties of our intention to consider the materials appended to the motions and invited them to submit objections.  Defendants contended that the matter they appended – two amicus briefs filed by the Federal Communications Commission in a related action, two of that agency's publications, and two judicial opinions – are subject to judicial notice and thus may be considered by the Court on a Rule 12(b) motion.  At oral argument, Farina conceded that the Defendants' documents did not convert the pending motions on the issue of federal preemption into Rule 56 summary judgment motions. Accordingly, we treat the pending motions under Rule 12(b) and vacate the portion of the July 21, 2008 Order that advised the parties of our intention to treat the motions pursuant to Rule 56.

Judge Blake's ruling dismissing the cases was reversed by the United States Court of Appeal for the Fourth Circuit.  See Pinney v. Nokia, Inc., 402 F.3d 430 (4th Cir. 2005).  Significantly, while the Fourth Circuit reversed the Naquin case because it disagreed with Judge Blake's preemption determination, her decision dismissing the other consolidated cases, including Farina, was vacated on jurisdictional grounds.  Specifically, the Fourth Circuit held that Judge Blake lacked jurisdiction over Farina and the other consolidated cases that were brought on the basis of federal question jurisdiction, finding that all of the claims raised in the complaints stated only state law grounds and failed to satisfy the "substantial federal question" doctrine:

> The district court erred by not recognizing that its inquiry was limited by the well-pleaded complaint rule.  It should have considered only whether a disputed question of federal law is an essential element of one of the well-pleaded state claims.  See Franchise Tax Bd. [of Cal. v. Constr. Laborer's Vacation Trust], 463 U.S. [1,] 13, 103 S.Ct. 2841 [(1983)].  The district court went beyond this restricted inquiry and in effect anticipated (1) that Nokia would raise the affirmative defense that the state law claims are preempted by the [Federal Communications Act of 1934, 47 U.S.C. § 15 et seq. ("FCA")] and federal RF radiation standards and (2) that the Pinney plaintiffs would be called upon to rebut that defense.  The cases could be decided, the court concluded, only by resolving whether the claims are preempted by the FCA and the federal RF radiation standards.  Even if that is so, a preemption defense "that raises a federal question is inadequate to confer federal jurisdiction." Merrell Dow Pharms., Inc. v. Thompson, 478 U.S. 804, 808, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).  Again, "a case may not be removed to federal court on the basis of a federal defense, including the defense of preemption," even if the complaint begs the assertion of the defense, and even if "the defense is the only question truly at issue in the case." Franchise Tax Bd., 463 U.S. at 14, 103 S.Ct. 2841.

Pinney, 402 F.3d at 445-46.[2]

---

[2]Because it found no evidence that Congress intended the FCA to provide the exclusive remedy for claims like those asserted by the Plaintiffs, and because there was evidence that Congress intended to preserve such state law claims, the Pinney Court also concluded that the claims could not arise under federal law through the doctrine of complete preemption – a doctrine distinct from the affirmative defense of federal preemption that the Court addressed later in its decision.  Pinney, 402 F.3d at 451.

Following remand, Farina filed a Second Amended Complaint, and then the TAC, ostensibly to correct the name of a defendant.  On February 17, 2006, the newly added defendant, LG Mobilecomm, again removed the case to federal court by filing a Notice of Removal pursuant to 28 U.S.C. §§ 1332, 1441, 1446, and 1453.  The Judicial Panel on Multi-District Litigation again transferred this case to the District of Maryland.  On April, 25, 2007, Judge Blake held a hearing on, among other things, Farina's "Motion to Remand."  Following the hearing, Judge Blake remanded the case to the Eastern District of Pennsylvania, without a decision on Plaintiff's Motion to Remand to state court.  On February 4, 2008, we conducted a hearing on the remand Motion and on February 13, 2008, ruled: (1) that the Motion was untimely, and (2) that federal jurisdiction was proper under the Class Action Fairness Act, Pub. L. 109-2, 119 Stat. 4 (2005), codified, inter alia, at 28 U.S.C. §§ 1332(d) and 1453.

## II.    THE PLAINTIFF'S ALLEGATIONS

Farina alleges that there are over 190 million cell phone users in the United States.  (TAC ¶ 30.)  The Federal Communication Commission ("FCC") grants licenses to service providers to broadcast wireless signals on specific frequency bands.  (TAC ¶ 31.)  This license determines the specifications for cell phones sold by each provider.  (TAC ¶ 33.)  Farina contends that during every incoming and outgoing call, a cell phone user is exposed to RF emissions as a result of holding the cell phone in the customary manner, with the phone's antenna next to the user's head.  (TAC ¶¶ 34, 38.)  He alleges that cell phones he purchased and used were sold without a headset and also lacked any instruction as to the benefits of using a headset.  (TAC ¶ 36.)

Farina contends that the proper utilization of a headset eliminates RF exposure to the cell phone user's head.  (TAC ¶ 41.)  These headsets have been on the market during the period in

question, but the Defendants marketed them only as an accessory of convenience.  (TAC ¶ 41.)  He avers that Defendants knew or should have known of the biological risks associated with cell phone use and the associated RF exposure.  (TAC ¶ 42.)  Additionally, Defendants knew or should have known of the decrease in biological risk associated with a greater distance between the cell phone and the user and that properly designed headsets would increase this distance.  (TAC ¶¶ 43, 44.)  However, despite this knowledge, Defendants designed and marketed inadequate headsets.  (TAC ¶ 44.)

Farina avers that scientific and medical research has demonstrated the harmful biological effects from exposure to RF emissions within the radio frequencies used by cell phones.  (TAC ¶ 45.)  He claims Defendants knew or should have known of these studies, which date to the 1920s, as well as research in the 1960s showing that RF emissions are absorbed by human tissue and can harm the body.  (TAC ¶¶ 46, 48, 49.)  Additionally, studies have shown that an antenna is an especially efficient device used to deposit RF emissions into the human body, particularly the ultra-sensitive temporal lobe of the brain.  (TAC ¶ 50.)

Despite this knowledge, Farina contends that Defendants acted to minimize the public's knowledge of these studies and attempted to downplay the results in an effort to be free to mass produce cell phones without regulatory constraints.  (TAC ¶¶ 52, 53.)  Their primary method was assuming control of the American National Standards Institute ("ANSI") Committee in charge of regulating devices emitting RF radiation.  (TAC ¶ 53.)  Also, Defendants publically agreed to fund research into potential health concerns associated with cell phones, only to revoke funding, and minimize exposure of the studies, after they found potential dangers.  (TAC ¶ 54.)  Through this period, Farina asserts, despite contrary knowledge, Defendants – themselves and through their trade

associations – continued to publicly declare that cell phone use posed no health dangers.  (TAC ¶¶ 55-66.)

Farina alleges that Defendants have misrepresented the data and obscured information on the risks of cell phone use from the public by hiding and complicating specific absorption rate ("SAR") information and claiming that cell phones are "safe" when they really mean that cell phones have not been proven unsafe.  (TAC ¶¶ 87, 88, 89.)  He avers that many peer reviewed studies disclose widespread complaints such as headaches, sleep problems, and burning sensations in as little as fifteen minutes of cell phone use.  (TAC ¶¶ 90, 91, 92.)  Other studies have indicated potential changes in the blood-brain barrier, several types of damage to the brain, tumors, and cancer as results of exposure to microwave radiation.  (TAC ¶¶ 94, 95.)  Additional studies have shown the potential for acoustic neurinoma and brain cancer after extended use of analog cell phones and an increased risk for melanoma in the eye and neuroepitheliomatous for all cell phone use.  (TAC ¶¶ 96, 97.)  Farina alleges the biological harm is even greater for children.  (TAC ¶¶ 100-113.)  He contends that the use of a cell phone without a headset while driving increases the risk of automobile accidents.  (TAC ¶ 114.)  As a result, the neighboring states of New Jersey and New York as well as the District of Columbia have banned the use of cell phones while operating a motor vehicle.  (Id.)

Farina seeks to represent a class consisting of (a) all persons in the Commonwealth of Pennsylvania who purchased or leased cell phones and have **not** been diagnosed with any illness or injury resulting from the use of cell phones; and (b) all future purchases and lessees of cell phones who have **not** been diagnosed with any illness or injury resulting from the use of cell phones.  (TAC ¶ 115.)  Plaintiff asserts he is a member of the class along with potentially millions of others in the

Commonwealth.  (TAC ¶¶ 116-17.)[3]

Based on these factual averments, Farina asserts a claim of civil conspiracy, asserting that Defendants acted together to suppress the knowledge or risks associated with RF emissions from cell phone use and to sell and market defective cell phones which can adversely affect users, with intent to deceive the public by failing to warn of potential hazards.  (TAC ¶¶ 125-35.)  In Count II, he asserts a claim for breach of implied warranties based upon the facts that his cell phones did not come with headsets, their user manuals said they would be safe to use without a headset, and their warranties contained promises that the products were "free of defects."  (TAC ¶¶ 136-55.)  In Count III, he asserts a claim for breach of express warranty based on the allegation that the cell phones sold by Defendants fail the express promise of safe operation because it is not certain that the RF emissions from the cell phones are safe without a headset.  (TAC ¶¶ 157-58.)  Count IV seeks to

---

[3]Farina contends that questions of law or fact common to all members of the class which make class certification appropriate in this case, include: (a) whether Defendants, acting individually or collectively, failed to conduct appropriate, reasonable and adequate testing of cell phones to determine the association between RF emissions and biological effects and any risks to human health arising therefrom; (b) whether Defendants, acting individually or collectively, failed to conduct appropriate, reasonable and adequate research and studies to determine the association between RF emissions and the biological effects and health risks; (c) whether Defendants, acting individually or collectively, failed to warn or otherwise inform Plaintiff and other members of the Class of the association between RF emissions and biological effects and the risks to human health arising therefrom; (d) whether Defendants, acting individually or collectively, failed to provide headsets or other devices which would have eliminated, reduced or minimized the biological effects from RF emissions and the risk to human health arising therefrom; (e) whether Defendants falsely or deceptively misrepresented or failed to adequately disclose in their advertisements, promotional materials and other materials, among other things, the biological effects and potential health risks associated with the use of cell phones; (f) whether Defendants failed to adequately disclose the risk to driver safety from cell phones and failed to provide headsets or other devices which would reduce or minimize those risks; (g) whether Defendants made express or implied, direct or indirect, misrepresentations of fact or omitted and concealed material facts about cell phones; and (h) whether Defendants' conduct constituted a breach of express and/or implied warranties, violated the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 Pa. Cons. Stat. Ann. § 201-1 et seq., or violated other provisions of Pennsylvania statutory and common law.  (TAC ¶ 118.)

state a claim for violation of the Magnuson-Moss Warranty Improvement Act on the same grounds

as Counts II and III.  (TAC ¶¶ 159-65.)  Lastly, in Count VI, Farina seeks to state a claim under the

Pennsylvania Declaratory Judgment Act, 42 Pa. Cons. Stat. Ann. § 7531, that the Class is entitled

to a declaration that Defendants' conduct constitutes violations of Pennsylvania statutory and

common law, and declaratory relief requiring Defendants to supply headsets for cell phones

purchased by plaintiff and the Class.  (TAC ¶¶ 171-73.)[4]

## III.   PERSONAL JURISDICTION OVER CELLULAR ONE GROUP

In addition to the joint motions, Defendant Cellular One Group ("COG") has moved to

dismiss the TAC for lack of personal jurisdiction.  COG argues that it is not subject to either specific

or general jurisdiction.  For the following reasons, this motion is granted.

"[I]n reviewing a motion to dismiss under Rule 12(b)(2), we 'must accept all of the plaintiff's

allegations as true and construe disputed facts in favor of the plaintiff.' " Pinker v. Roche Holdings,

Ltd., 292 F.3d 361, 368 (3d Cir. 2002) (quoting Carteret Sav. Bank, F.A. v. Shushan, 954 F.2d 141,

142 n.1 (3d Cir. 1992)).  Nonetheless, a motion made pursuant to Rule 12(b)(2) "is inherently a

matter which requires resolution of factual issues outside the pleadings, i.e. whether in personam

jurisdiction actually lies." Time Share Vacation Club v. Atl. Resorts, Ltd., 735 F.2d 61, 66 n.9 (3d

Cir. 1984).  Accordingly, "[o]nce the [lack of personal jurisdiction] defense has been raised, then the

---

[4]Count V asserted that Defendants' actions constituted unfair deceptive acts or practices in violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law.  (TAC ¶¶ 167-70.)  At oral argument, the parties presented a stipulation dismissing Count V based on the recent decision of the United States Court of Appeals for the Third Circuit in Hunt v. U.S. Tobacco Co., No. 07-2134, 2008 WL 2967249 (3d Cir. Aug. 5, 2008) (holding that a plaintiff alleging deceptive – rather than fraudulent – conduct must plead justifiable reliance on the defendant's alleged deceptive conduct or statements to sustain a claim under the current, post-1996 amendment version of the statute's "catch-all" provision).

plaintiff must sustain [his] burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence," and may not "rely on the bare pleadings alone . . . ." Id.; see also O'Connor v. Sandy Lane Hotel Co., Ltd., 496 F.3d 312, 316 (3d Cir. 2007) ("Once challenged, the plaintiff bears the burden of establishing personal jurisdiction." (citing General Elec. Co. v. Deutz AG, 270 F.3d 144, 150 (3d Cir. 2001))).   "Any disputes created by the affidavits, documents, or other records submitted for the court's consideration are resolved in favor of the non-moving party."  Chin v. Multivac, Inc., Civ. A. No. 07-3436, 2007 WL 4106272, at *1 (E.D. Pa. Nov. 15, 2007) (citing Irons v. Transcor Am., Civ. A. No. 01-4328, 2002 WL 32348317 (E.D. Pa. July 8, 2002)).  The plaintiff must establish the defendant's contacts with the forum state with reasonable particularity.  Snyder v. Dolphin Encounters Ltd., 235 F. Supp. 2d 433, 436 (E.D. Pa. 2002) (citation omitted).

Pursuant to Federal Rule of Civil Procedure 4(e), a federal court may exercise personal jurisdiction over a nonresident of the state in which the court sits "to the extent permissible under the law of the state where the district court sits." Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 200 (3d Cir. 1998) (citation omitted).  Pennsylvania's long arm statute authorizes the exercise of jurisdiction over a nonresident "to the fullest extent allowed under the Constitution of the United States." 42 Pa. Cons. Stat. Ann. § 5322(b); see also O'Connor, 496 F.3d at 316 (noting that the Pennsylvania long arm statute "provides for jurisdiction 'based on the most minimum contact with th[e] Commonwealth allowed under the Constitution of the United States'" (quoting 42 Pa. Cons. Stat. Ann. § 5322(b) and citing Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino, 960 F.2d 1217, 1221 (3d Cir. 1992))).

In evaluating whether an exercise of personal jurisdiction is constitutional, a court first

determines whether the defendant's contacts with the forum state are sufficient to support general personal jurisdiction. Pennzoil, 149 F.3d at 200. General jurisdiction exists where a nonresident's contacts with the forum are "continuous and substantial," and permits the court to exercise jurisdiction "regardless of whether the subject matter of the cause of action has any connection to the forum." Id. (internal quotations omitted). In the absence of general jurisdiction, a court looks to whether the requirements of specific personal jurisdiction are met. Id. at 200-01. "Specific jurisdiction exists where the plaintiff's claim 'is related to or arises out of the defendant's contacts with the forum.'" Id. at 201 (quoting Farino, 960 F.2d at 1221). "To establish specific jurisdiction a plaintiff must show that the defendant has minimum contacts with the state 'such that [the defendant] should reasonably anticipate being haled into court there.'" North Penn Gas Co. v. Corning Natural Gas Corp., 897 F.2d 687, 690 (3d Cir. 1990) (quoting World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)). "Specific jurisdiction is established when a nonresident defendant has 'purposefully directed' his activities at a resident of the forum and the injury arises from, or is related to, those activities. General Elec. Co., 270 F.3d at 150.

General jurisdiction over a non-resident defendant is established where the defendant's contacts with the forum state are "'continuous and systematic.'" Pinker, 292 F.3d at 368 n.1 (3d Cir. 2002) (quoting Int'l Shoe Co. v. Washington, 326 U.S. 310, 317 (1945)). Plaintiff has a high "'threshold to meet for the facts required to assert . . . general jurisdiction [which] must be extensive and persuasive.'" Kuehnemund v. Agrium, Inc., Civ. A. No. 07-83, 2007 WL 3334974 (W.D. Pa. Nov. 8, 2007) (quoting Reliance Steel Prods. Co. v. Watson, Ess, Marshall & Enggas, 675 F.2d 587, 589 (3d Cir. 1982)). See also Zombeck v. Amada Co. Ltd., Civ. A. No. 06-953, 2007 WL 4105231 (W.D. Pa. Nov. 15, 2007) (same) (citing Allied Leather Corp. v. Altama Delta Corp., 785 F. Supp.

494, 497 (M.D. Pa. 1992)).  Even "continuous activity of some sorts [by a corporation] within a state is not enough to support [general jurisdiction over the corporation]." Nichols v. G.D. Searle & Co., 991 F.2d 1195, 1199 (4th Cir. 1993) (quoting Int'l Shoe, 326 U.S. at 318).  "Only when the 'continuous corporate operation within a state [is] thought so substantial and of such a nature as to justify suit against it on causes of action arising from dealings entirely distinct from those activities' may a court assert general jurisdiction over a corporate defendant." Id. (quoting Int'l Shoe, 326 U.S. at 318).

Federal courts sitting in Pennsylvania consider the following objective criteria in ascertaining the existence of general jurisdiction over a corporate defendant: (1) whether the defendant is "incorporated or licensed to do business in Pennsylvania;" (2) whether the defendant has "ever filed any tax returns with the Commonwealth of Pennsylvania;" (3) whether the defendant files "administrative reports with any agency or department of the Commonwealth;" (4) whether "the defendant regularly purchase[s] products or supplies within Pennsylvania for use in its business outside of the state;" (5) whether "the defendant own[s] land or property within the state;" (6) whether "the defendant advertise[s] in Pennsylvania;" and (7) whether "the defendant maintain[s] an agent in Pennsylvania." Gaylord v. Sheraton Ocean City Resort & Conference Ctr., Civ. A. No. 93-0463, 1993 WL 120299 (E.D. Pa. Apr. 15, 1993) (citing Wims v. Beach Terrace Motor Inn, Inc., 759 F. Supp. 264, 269 (E.D. Pa. 1991)).

COG maintains that it does not have sufficient contacts with the Commonwealth of Pennsylvania to enable this Court to exercise general personal jurisdiction over it, and that Farina's claim does not arise out of its purposeful availment of the jurisdiction.  COG has submitted the Affidavit of Camille Cadman ("Cadman Aff.") attesting that:

-11-

1.    COG was a general partnership organized under Delaware law and then later Oklahoma law,[5] with its principal place of business located at different times in Texas, Oklahoma and Washington, Cadman Aff. ¶ 1;

2.    it has never been authorized or registered to conduct business in Pennsylvania, id. ¶ 2;

3.    it does not maintain a place of business; own real property; have operations, employees, agents or representatives; have bank accounts; advertise; maintain a mailing address or telephone listing; conduct business; generate sales or revenues; pay or been assessed taxes; or have an agent for receipt of service of process in Pennsylvania, id. ¶ 3;

4.    it does not operate a cell phone business or other telecommunications system in Pennsylvania; does not manufacture, distribute, promote, sell or supply cell phones in Pennsylvania; has never provided a warranty for a cell phone, serviced or repaired a cell phone in Pennsylvania; has never been granted a license by the FCC to broadcast wireless signals in Pennsylvania; and has never owned or operated a cell tower or landline in Pennsylvania; id. ¶¶ 4-9.

5.    COG is exclusively a trademark licensor of the Cellular One trademark and related marks; its business was to license and promote trademarks and service marks in Texas, Oklahoma and Washington; id. ¶ 10.

COG argues that none of these activities give rise to either specific or general jurisdiction in Pennsylvania.

Farina responds by asserting that COG has an internet site, www.cellularone.com, which lists

---

[5]Farina notes the use of the past tense "was" in this averment questioning whether it is currently true. We read the averment's use of "was" and "then" in the same sentence to mean COG was organized in Delaware and then moved to Oklahoma.

twenty-nine retail locations for "CellularOne" in Pennsylvania, all of which are operated under the name "CellularOne," and which advertise and offer for sale "CellularOne" products.  Farina argues that the website cannot be reconciled with COG's representations that it has no connection with the Commonwealth.  (Pl. Mem. at 3.)

We find that Farina has failed to sustain his burden of proof in establishing jurisdictional facts with reasonable particularity.  He has offered no sworn affidavits; his only "competent" evidence consists of page views from the above-mentioned website.  However, he has not established that the website belongs to COG, rather than some other entity.  He has not established that the listed retail locations are owned, operated and maintained by COG, rather than some other entity.  This is particularly important since COG avers it is in the business of licensing the "CellularOne" trademark to other entities, an allegation Farina does not dispute.  A licensor of a mark cannot be subject to personal jurisdiction in a state solely because its licensee is located in that state.  See Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1361 (Fed. Cir. 1998) (holding that a licensee's contacts with a forum state are not, standing alone, enough to bring a licensor within the personal jurisdiction of the same state).  Merely doing business with someone who does business in Pennsylvania does not mean that COG itself does business in Pennsylvania.

As COG's evidence has established that it does not have contacts with the forum that are "continuous and substantial," there is no general jurisdiction.  Pennzoil, 149 F. 3d at 200.  Likewise, as it has established that Farina's injuries do not arise out of its  minimum contacts with Pennsylvania, there is no specific jurisdiction.  Indeed, Farina's only evidence in support of its jurisdictional argument is the page views from a website he has not established belongs to COG.  We conclude, therefore, that Farina has failed to meet his jurisdictional burden to show either

specific or general jurisdiction. Accordingly, COG's motion to dismiss for want of personal jurisdiction is granted.

## IV.   FEDERAL PREEMPTION

Defendants move to dismiss the TAC because, they assert, Farina's state law claims conflict with federal law and are therefore preempted.[6] They assert arguments relating to conflict preemption, field preemption and express preemption. These same issues were raised to and rejected by the Fourth Circuit when it decided the appeal of Judge Blake's decision dismissing this case, as well as Naquin and the other three class actions. Accordingly, the threshold question is whether the Pinney decision qualifies as the law of the case. We conclude that it does not. After an independent review of the applicable case law, we reach the same decision as the Fourth Circuit on the issue of express preemption, namely, that the state law claims are not preempted under that theory. However, we conclude that the rationale used in Pinney to decide the issue of implied preemption does not comport with binding case law from the United States Court of Appeals for the Third Circuit; that applying Third Circuit case law leads to the conclusion that Farina's claims are subject to conflict preemption and must be dismissed.

---

[6]When considering a motion to dismiss pursuant to Rule 12(b)(6), we take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff. Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (citing Pinker, 292 F.3d at 374 n.7). A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'" Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1964 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)). While the Complaint's factual allegation need not be detailed, the grounds upon which the claim rests must be "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Id. at 1964-65 (citation omitted). In the end, we will grant the 12(b)(6) motion if the factual allegations in the complaint are not sufficient "to raise a right to relief above the speculative level." Twombly, 127 S. Ct. at 1965 (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, ¶. 235-236 (3d ed. 2004)).

A.     Law of the Case Doctrine

The United States Court of Appeals for the Third Circuit has stated that the law of the case doctrine is a discretionary principle that "is designed to protect traditional ideals such as finality, judicial economy and jurisprudential integrity." In re City of Philadelphia Litig., 158 F.3d 711, 717-18 (3d Cir. 1998). "[L]aw of the case is an amorphous concept. As most commonly defined, the doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." Arizona v. California, 460 U.S. 605, 618 (1983). "Law of the case rules have developed 'to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit.'" Casey v. Planned Parenthood of Southeastern Pennsylvania, 14 F.3d 848, 856 (3d Cir. 1994) (quoting Charles A. Wright et al., 18 Federal Rules and Practice § 4478 (1981)). See also Harbor Ins. Co. v. Essman, 918 F.2d 734, 738 (8th Cir. 1990) (holding that "law of the case" is a doctrine of discretion which provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case; however, where the case *sub judice* is merely related to, but not the "same case," the law of the case doctrine does not apply). Other law of the case rules apply to subsequent rulings by the same judge in the same case or a closely related one, to rulings by different judges at the same level, or to the consequences of the failure to preserve an issue for appeal. Casey, 14 F.3d at 856 n.11 (citing Charles A. Wright et al., 18 Federal Rules and Practice § 4478 (1981)). "They do not apply between separate actions," and the doctrine "does not reach a matter that was not decided." Charles A. Wright et al., 18 Federal Rules and Practice § 4478.

Defendants argue that the law of the case doctrine does not apply to the question of federal preemption because the Fourth Circuit decided the Farina appeal on different grounds from that used

to decide the Naquin appeal.  They argue that, since Judge Blake's Farina decision was vacated because she lacked jurisdiction, the merits of the federal preemption issue were never reached *viz* Farina.  Finally, they contend that the Fourth Circuit's discussion of the issue in Naquin was not a decision in the same case; thus, we are free to apply our own understanding of federal preemption law to the merits of  Farina.  We agree.

In Pinney, the Fourth Circuit clearly articulated that it was not addressing the merits of preemption in the cases where it found that Judge Blake lacked subject matter jurisdiction, including Farina.  After first concluding that none of the Plaintiffs' claims could arise under federal law – because it found the jurisdictional doctrine of complete preemption did not apply and because the "well-pleaded complaint rule did not permit consideration of the affirmative defense doctrine of complete preemption – the Court went on to state:

> After the district court denied the Pinney plaintiffs' motion to remand their four cases to state court, it dismissed all five cases, including the one brought by the Naquin plaintiffs, on the ground that the claims are preempted by the [FCA].  Because the district court lacked subject matter jurisdiction over the four cases brought by the Pinney plaintiffs, the district court had no power to dismiss them.  However, as we noted earlier, the district court has diversity jurisdiction over the case brought by the Naquin plaintiffs.  See 28 U.S.C. § 1332(a).  We must therefore review the district court's order granting Nokia's motion to dismiss the claims of the Naquin plaintiffs.

Pinney, 402 F.3d at 451.  Later, in its concluding paragraph, the Court again specifically stated that its merits ruling was expressly limited to the Naquin class:

> For the foregoing reasons, we reverse the district court's order denying the consolidated motion to remand made by the plaintiffs in the Pinney, Farina, Gilliam, and Gimpelson cases.  Because federal subject matter jurisdiction does not exist over these four cases, we return them to the district court for remand to the state courts in which they originated.  We also reverse the district court's order dismissing the Naquin plaintiffs' case as preempted by the FCA.  That case is remanded to the district court for further proceedings.

-16-

Id., 402 F.3d at 459.  Because the Farina decision was vacated for want of subject matter jurisdiction, the Fourth Circuit never reached the merits of the preemption decision in this case.  Hence, Pinney cannot be considered the law of the case controlling our decision on the affirmative defense preemption issue.

B.      Binding Case Law on Federal Preemption

Under the Supremacy Clause, a state law that "interferes with, or is contrary to" federal law is invalid.  Free v. Bland, 369 U.S. 663, 666 (1962); see also Medtronic, Inc. v. Lohr, 518 U.S. 470, 500 (1996) (holding that the "overarching concern" of preemption analysis is that a particular state requirement threatens to interfere with a specific federal interest).  The Supreme Court has identified three major situations where federal preemption applies:  (1) "express" preemption, which is applicable when Congress expressly states its intent to preempt state law; (2) "field" preemption, which is applicable when "Congress' intent to pre-empt all state law in a particular area may be inferred [because] the scheme of federal regulation is sufficiently comprehensive" or "'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject;'" and (3) "conflict" preemption, which is applicable when "state law is nullified to the extent that it actually conflicts with federal law," even though Congress has not displaced all state law in a given area.  Hillsborough County v. Automated Med. Labs., Inc., 471 U.S. 707, 713 (1985) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).  See also Colacicco v. Apotex Inc., 521 F.3d 253, 261 (3d Cir. 2008) (citing Hillsborough County and holding that, by its passage of the Federal Food, Drug, and Cosmetic Act, Congress impliedly preempted state law tort actions against drug manufacturers on the theory that the drugs' labeling failed to warn of their association with an increased risk of suicidality).

-17-

"A conflict between state and federal law 'arises when compliance with both federal and state regulations is a physical impossibility or when state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" Colacicco, 521 F.3d at 265 (quoting Hillsborough County, 471 U.S. at 713).  In contrast to express preemption, both field preemption and conflict preemption are forms of "implied preemption."  Id. at 261 n.6 (citing Geier v. Am. Honda Motor Co., 529 U.S. 861, 884 (2000); Freightliner Corp. v. Myrick, 514 U.S. 280, 287 (1995)). "However, the Supreme Court has also asserted that these three categories are not 'rigidly distinct;' for example, 'field pre-emption may be understood as a species of conflict preemption:  A state law that falls within a pre-empted field conflicts with Congress' intent (either express or plainly implied) to exclude state regulation.'" Id. (citing English v. Gen. Elec. Co., 496 U.S. 72, 79-80 n.5 (1990).

      1.      The Presumption Against Preemption

The Supreme Court has held that "[c]onsideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." Maryland v. Louisiana, 451 U.S. 725, 746 (1981) (citation omitted); Lohr, 518 U.S. at 485 (holding that "because the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action").  How this presumption against preemption is to be applied constitutes a major distinction among the cases.  In Colacicco, the Third Circuit discussed at length its proper application to the three forms of preemption.  It noted that Supreme Court precedents have not been consistent across the three areas.  For example, in some preemption cases, particularly those involving state health and safety regulations and police powers, such as

Hillsborough County and Lohr, the Court held that a presumption against preemption did exist.[7]

However, in other preemption cases where "traditional" state interests are lacking, the Supreme

Court declined to apply a presumption against preemption.  See Buckman Co. v. Plaintiffs' Legal

Committee, 531 U.S. 341 (2001) (declining to apply a presumption against preemption where the

plaintiff alleged fraud on the FDA); United States v. Locke, 529 U.S. 89, 94 (2000) (declining to

apply a presumption against preemption to Washington State laws governing maritime oil tanker

operations).[8]  The Third Circuit noted that the Supreme Court has found that "even where an express

preemption saving clause demonstrated Congress' intent to exempt common-law tort actions from

preemption, the language of the saving clause did not suggest an intent to 'bar the ordinary working

---

[7]In Hillsborough County, the Court stated that there is a "presumption that state or local regulation of matters related to health and safety is not invalidated under the Supremacy Clause," 471 U.S. at 715, and then proceeded to analyze whether local regulations imposed on blood plasma centers "conflict with the federal scheme."  Id. at 720.  In Lohr, the Supreme Court stated: "[i]n all pre-emption cases, and particularly in those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  Lohr, 518 U.S. at 485.

[8]In Buckman, plaintiffs, who claimed injuries from the use of orthopedic bone screws, brought suit against the consultant to the manufacturer on the theory that its statements defrauded the FDA and led the agency to approve a device that caused the plaintiffs' injuries.  See 531 U.S. at 343, 347-48.  The Supreme Court held that plaintiffs' fraud claims were preempted, rejecting the argument that there was a "virtually irrefutable presumption against implied preemption of private damage remedies predicated on an alleged conflict with a federal remedial scheme."  Id. at 351 (internal quotation marks omitted).  Because "the relationship between a federal agency and the entity it regulates . . . originates from, is governed by, and terminates according to federal law," the Court concluded that the plaintiffs' claims did not implicate the traditional state interest in the regulation of public health and safety, and thus it did not apply the presumption against preemption. Id. at 347-48.

Likewise, in Locke the Court declined to apply a presumption against preemption, explaining that the case concerned "national and international maritime commerce," a field in which "Congress has legislated . . . from the earliest days of the Republic."  Id., 529 U.S. at 94.  The Court noted that "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence."  Id.

of conflict pre-emption principles' or preserve 'state-law tort actions that conflict with federal regulations.'" <u>Colacicco</u>, 521 F.3d at 265 (quoting <u>Geier</u>, 529 U.S. at 869 (plaintiff's tort action against automobile manufacturer for failing to install air bags was preempted under conflict preemption principles although expressly saved from preemption by statute)). It concluded that "the Supreme Court's case law makes clear that 'the purpose of Congress [is] the ultimate touchstone of pre-emption analysis.'" <u>Id.</u> at 264 (quoting <u>Cipollone v. Liggett Group, Inc.</u>, 505 U.S. 504, 516 (1992)).[9]

We must be guided in our application of any presumption against preemption by the distinction between traditional and non-traditional state law interests. The regulation of the health risks associated with cell phone use arguably falls within the traditional areas of state law interests. Further, the purpose of Congress in enacting the statutes that form the basis of Defendants' express preemption arguments – the "ultimate touchstone" for preemption analysis – leads to the conclusion that Farina's state law claims should not be subject to express preemption. Nonetheless, we conclude that Congress, through its establishment of the FCC and its grant to that agency of plenary jurisdiction over the technical standards for radio communications, has impliedly preempted contrary state laws regarding RF emissions. Similar to the area of maritime commerce at issue in <u>Locke</u>,

---

[9]At the conclusion of this analysis, the Court stated,

> we recognize the applicability of the presumption against preemption, but note the tension between such a presumption, which emphasizes the "clear and manifest purpose of Congress," . . . and implied conflict preemption, which analyzes preemption in the absence of any explicit intent. . . .

<u>Colacicco</u>, 521 F.3d at 265 (internal citations and footnote omitted).

radio communication has been the subject of Congressional regulation since its "earliest days."[10] Further, as noted by defense counsel at oral argument, the telecommunications industry is not merely a product of commerce; like the maritime industry, it is an instrumentality of commerce that has been subject to consistent national regulation.  Given this history of significant federal regulatory presence, we approach the issue of implied preemption from the standpoint that traditional state interests are lacking.

2.      Express Preemption

Express preemption applies to bar state law claims where Congress has expressly declared its intent to preempt state law.  Colacicco, 521 F.3d at 261 (citing Hillsborough County, 471 U.S. at 713); Lindsey v. Caterpillar, Inc., 480 F.3d 202, 205 (3d Cir. 2007).  Also, a "federal agency may explicitly preempt state law through its regulations so long as the agency acts within its congressionally-delegated authority." Id. at 205 (citing Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta, 458 U.S. 141, 153-54 (1982).  Defendants argue for express preemption based on two specific sections of the FCA: 47 U.S.C. §§ 332(c)(3)(A) and 332(c)(7)(B)(iv).

Section 332 of Title 47 vests the FCC with authority to manage, and make available for the use of cell phones, certain portions of the radio spectrum.  In so doing, Congress has charged that, in taking actions to manage the radio spectrum, the FCC must consider whether its actions will "(1) promote the safety of life and property; (2) improve the efficiency of spectrum use and reduce the regulatory burden upon spectrum users, based upon sound engineering principles, user operational requirements, and marketplace demands; (3) encourage competition and provide services to the

---

[10]See e.g., Nat'l Broad. Co. v. United States, 319 U.S. 190, 210 (1943) (noting that federal regulation of radio began with the Wireless Ship Act of June 24, 1910).

largest feasible number of users; or (4) increase interservice sharing opportunities between private mobile services and other services."  47 U.S.C. § 332(a).

In the same statute, Congress also provided for regulation of the cell phone industry.  For example, it has legislated that commercial providers of mobile services are deemed to be common carriers, 47 U.S.C. § 332(c)(1)(A).  Most importantly, in § 332(c) Congress also provided specific rules for the preemption of state laws:

> (3) State preemption
>
> > (A) . . . no State or local government shall have any authority to regulate the *entry of or the rates charged* by any commercial mobile service or any private mobile service, *except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services*.  Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates.
> > . . .
> (7) Preservation of local zoning authority
>
> > (A) General authority
> >
> > Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.
> >
> > (B) Limitations
> > . . .
> >
> > > (iv) No State or local government or instrumentality thereof may regulate the placement, construction, and modification of *personal wireless service facilities on the basis of the environmental effects of radio frequency emissions* to the extent that such facilities

-22-

> comply with the Commission's regulations concerning
> such emissions.

47 U.S.C. §§ 332(c)(3), (7) (emphasis supplied).

Defendants assert, citing § 332(c)(7)(B)(iv), that Farina's state law claims fall directly within the prohibition on state laws that regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of RF emissions. Defendants assert that cell phones constitute "personal wireless services facilities" and that Farina's claims are all based on the allegedly adverse environmental effects of RF emissions. They also argue, citing § 332(c)(3), that any claim premised upon the failure of manufacturers and carriers to include specific components or warnings in order to sell cell phones would constitute a regulation of the "entry" into the wireless marketplace. Thus, Defendants contend, all of Farina's claims are expressly preempted by these sections of the FCA.

Judicial treatment of these arguments has not been consistent. These arguments were accepted by Judge Blake in all of the consolidated cases, but rejected by the Fourth Circuit in Pinney. Following remand from the MDL proceeding, motions raising similar preemption issues were filed and granted in several consolidated former companion MDL cases after those cases were remanded to the District of Columbia Superior Court. See Murray v. Motorola, Inc., Civ. No. 01-8479 (D.C. Super. Ct. Aug. 24, 2007) ("Murray slip op."). On the issue of express preemption, we reach the same conclusion as the Fourth Circuit: nothing in the FCA expressly preempts state common law designed to ensure the health and safety of cell phone users.

        A.      Express Preemption Arising from Subsection (7)'s Use of the Term

             "Personal Wireless Service Facilities"

In addressing the argument regarding the limitation on state regulation contained in section

332(c)(7)(B)(iv), the <u>Pinney</u> Court stated:

> Nokia asserts that the claims are expressly preempted by § 332(c)(7)(B)(iv), which
> limits the general authority of local bodies . . . .  This section applies only to
> "personal wireless service facilities," a term defined in circular fashion as "facilities
> for the provision of personal wireless services."  47 U.S.C. § 332(c)(7)(C)(ii).  The
> statute does not define the term "facilities" or "facility."  We must therefore
> determine, as a matter of first impression, whether a wireless telephone constitutes
> a "facility" for purposes of § 332(c)(7)(B)(iv).  We conclude that it does not.

<u>Pinney</u>, 402 F.3d at 454.  The Court found that when the specific and broader contexts of the term

"facility" were considered, it became plain that a cell phone is not itself a "facility."  It reasoned:

> Because § 332(c)(7) deals with the authority of the states over zoning and land use,
> we conclude that Congress intended the term "facility" to mean a structure or object,
> such as a base station or a mobile telephone switching office (MTSO), that falls
> within the states' zoning or land use authority.  This interpretation excludes devices,
> such as wireless telephones, that are completely portable and have no attachment to
> land.  The broader context in which the term "facility" is used also supports the
> interpretation that the term does not include wireless telephones. . . .  Congress
> enacted the entire § 332 to ensure the availability of a nationwide network of wireless
> service coverage.  Consistent with this objective, a facility should, at the very least,
> be part of the infrastructure (a base station or an MTSO, for example) that provides
> wireless service coverage.  A wireless telephone, however, only accesses a wireless
> service provider's network of coverage; a wireless telephone itself is not part of the
> underlying infrastructure.  Because both the specific context of the use of the term
> "facilities" in § 332(c)(7) and the broader context (and purpose) of § 332 reveal that
> a wireless telephone is not a facility under § 332(c)(7)(B)(iv), state tort claims
> relating to the manufacture and sale of wireless telephones are not expressly
> preempted by § 332(c)(7)(B)(iv).

<u>Id.</u> at 455.

In her decision in <u>Murray</u>, Judge Cheryl Long of the D.C. Superior Court disagreed with this

analysis.  She found that the <u>Pinney</u> Court's choice to define facilities as structures and objects was

based solely on the title of the subsection – "Preservation of local zoning authority" – and ignored

what she found to be expansive language in the subsection:

> the wording that follows the reference to "local zoning" also includes a reference to "personal" wireless service facilities. Moreover, such references cannot supplant the more specific language in the Act forbidding states and localities from predicating regulatory actions "on the basis of the environmental effects of radio frequency emissions" as it is stated in the same Act. . . .  For several distinct reasons, this Court cannot agree with the analysis used by the Fourth Circuit in concluding that hand-held wireless cellular phones are not "facilities" within the meaning of the [FCA].
>
> One, whether or not the <u>Pinney</u> plaintiffs did so in their own Complaints, the plaintiffs herein plainly do regard the hand-held phones as part of the overall cellular phone facilities regulated by the FCC. . . .  The <u>Murray</u> plaintiffs have defined "the cell phone" to include "base stations, antennas, land lines, and switching offices, all of which are necessary for the operation of a cell phone. . . .  This definition eliminated the relevance of the Fourth Circuit's definition of "facilities."

<u>Murray</u> slip op. at 37-39.  She also concluded that there was a "bedrock mandate" that Congress gave

to the FCC to maintain control over all the channels of radio transmission.  <u>Id.</u> at 39 (citing 47 U.S.C.

§ 301).  She found it was not possible for the FCC to maintain control over wireless telephones as

an entire "channel" of radio transmission if the point of usage – the cell phone itself – was not under

federal control.  <u>Id.</u> at 39-40 ("The onus is not on the agency to continually hunt for statutory

language that literally covers exemption issues from one detail of its operation to another.")

Citing Judge Long's decision in <u>Murray</u>, as well as dictionary definitions, Defendants argue

that a cell phone is a personal wireless service facility because "facility" typically refers to that which

promotes the ease of any action.  (Def. Mem. at 35 (citing <u>Black's Law Dictionary</u> 591 (6th ed.

1990))).  They also argue, again citing <u>Murray</u>, that the phone itself is integral to the provision of

personal wireless services because it permits the customer to receive and transmit the radio signal.

We reject this argument.

While the Fourth Circuit's discussion of the meaning of "facility" is well-reasoned and

thorough, Defendants' argument in favor of a contrary result ignores the clear context of the term "personal wireless service facilities."  The preemption statute is narrowly concerned with attempts by the states, based on environmental concerns, to interfere through zoning and land use regulations with the infrastructure required to establish and maintain national cellular networks.  The statute simply does not speak in terms of the cell phones used to access that infrastructure.  It seems unreasonable that a statutory section concerned with the parameters of local zoning authority could be read to affect state common law standards of care applying to an allegedly defective product. Judge Long cogently criticizes Pinney for ignoring the bedrock mandate that Congress gave the FCC to regulate radio, but we cannot ignore the fact that Congress narrowly chose to expressly limit state environmental zoning regulation over "facilities."  As such, we reject Defendants' reliance on dictionary definitions of "facilities" to stretch the term beyond Congress's clearly articulated context.

Accordingly, we adopt the holding of the Fourth Circuit that § 332(c)(7) does not expressly preempt state tort law.

> B.     Express Preemption Arising from Subsection (3)'s Prohibition on State Regulation of "Entry" and "Rates"

The other section upon which Defendants rely in asserting that Congress has expressly preempted state tort law is the prohibition on state regulation of "the entry of or the rates charged by any commercial mobile service."  47 U.S.C. § 332(c)(3)(A).  Defendants argue that a "judge or jury-set requirement forcing manufacturers and carriers to add specific components (i.e., headsets) and warnings in order to sell cell phones would clearly be regulating 'entry' into the wireless marketplace."  (Def. Mem. at 38.)  For the following reasons, we find that this argument was also correctly rejected by the Fourth Circuit.

In Pinney, Defendant Nokia similarly argued that a state law, court-imposed requirement that cell phones have headsets would constitute a market entry barrier because plaintiffs would be permitted to use state tort law to regulate technical specifications for cell phones. The Fourth Circuit found nothing in Subsection 3's prohibition on entry regulations to constitute an express preemption:

> While § 332(c)(3)(A) is unclear as to what precisely constitutes a barrier to entry into the PCS market, we conclude that the relief sought by the Naquin plaintiffs (a headset requirement) is not such a barrier. To begin with, the PCS market is a market for wireless service. Wireless service providers use base stations and MTSOs to create a network of coverage, a network that wireless telephone users generally pay a fee to access. The FCC licenses portions of the radio spectrum to wireless service providers so they can provide PCS coverage, see 47 C.F.R. § 24.1(a), (b), and one of the main requirements for the grant of a license is that the licensee must construct enough base stations to provide coverage to the area for which it receives a license. 47 C.F.R. §§ 24.103, 24.203. Accordingly, in order for state law to constitute a barrier to entry, it must, at a minimum, obstruct or burden a wireless service provider's ability to provide a network of wireless service coverage. . . .
>
> A headset requirement for wireless telephones would not constitute a barrier to entry into the PCS market because wireless telephones are only used to access a wireless service provider's network of coverage; the telephones themselves do not provide the actual coverage. . . . Because the relief sought by the Naquin plaintiffs would not be a barrier for wireless service providers seeking to enter the PCS market, § 332(c)(3)(A) does not expressly preempt the claims of the Naquin plaintiffs.

Pinney, 402 F.3d at 455-56 (internal citations omitted).

Once again, Judge Long reached the opposite conclusion in Murray. She found that any attempt to hold a manufacturer or cellular service provider to a radio frequency standard higher than that required by the FCC was a barrier to entry into the marketplace. Murray slip op. at 23. She reasoned:

> The meaning of the term "entry" requires a close look, because the depth, breadth or character of what is sought in a lawsuit can effectively prohibit the "entry" of a particular product or service provider.
>
> There is no doubt that "entry" is denoted by the issuance of a federal license which, in turn, is earned when the applicant has established compliance with the "radiofrequency radiation exposure requirements . . . for both fundamental emissions

and unwanted emissions." 47 C.F.R. § 24.52 (1996). . . . Plaintiff effectively creates a barrier to entry into the market by extending this lawsuit to "the entire system(s) used to transmit voice and/or data transmissions from and/or to the cell phone. . . ." These lawsuits reach all facets of the wireless telephone market. . . .  At the risk of stating the obvious, the reasons why these lawsuits pose a barrier to market entry is that the use of potential jury verdicts based upon competing RF emissions standards would create a new hurdle for participating in the market.

<u>Murray</u> slip op. at 23-24.

We again adopt the Fourth Circuit's rationale and reject the Defendants' position.  Their argument, and Judge Long's analysis, conflate agency regulations on RF emissions from cell phones with Congress's express preemption of state regulation of market entry for wireless services.  It must be remembered that Subsection 3 only expressly preempts state laws that regulate market entry or rates, while *preserving* state regulation of "the other terms and conditions of commercial mobile services."  47 U.S.C. § 332(c)(3); <u>see</u> <u>Peck v. Cingular Wireless, LLC</u>, No. 06-36027, 2008 WL 3091412, *4 (9th Cir. Aug. 7, 2008) (holding that Congress did not intend Subsection 3's prohibition on state laws regulating entry to preempt state law allowing cellular providers to itemize tax and pass it along to its customers; such regulation would be of "other terms and conditions").  This distinction, we find, is consistent with the Fourth Circuit's admonition that, in order for state law to constitute a barrier to entry, it must, at a minimum, obstruct or burden a wireless service provider's ability to provide a network of wireless service coverage.  We conclude that <u>Pinney</u>'s finding that Congress's intent in enacting Subsection 3 was to prevent the states from obstructing the creation of nationwide cellular service coverage, and not the preemption of health and safety and police powers, is correct.

Thus, we conclude that Subsection 3's prohibition on conflicting market entry rules also does not expressly preempt Farina's state law claims.

-28-

3.    Implied Preemption

There are two types of implied preemption: field preemption and conflict preemption.  Field preemption applies when Congress's "intent to preempt all state law in a particular area may be inferred [because] the scheme of federal regulation is sufficiently comprehensive" or "'the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.'"  Colacicco, 521 F.3d at 261 (quoting Hillsborough County, 471 U.S. at 713).  "'Conflict' preemption applies when 'state law is nullified to the extent that it actually conflicts with federal law,' even though Congress has not displaced all state law in a given area."  Id.  Stated another way, "the State may not, under the guise of exercising its police power or otherwise, . . . enact legislation in conflict with the statutes of Congress passed for the regulation of the subject. . . ."  McDermott v. Wisconsin, 228 U.S. 115, 131-32 (1913); see also Pennsylvania Employees Ben. Trust Fund v. Zeneca Inc., 499 F.3d 239, 247 (3d Cir 2007) (implied conflict preemption renders state law "without effect" when, without "express congressional command," state law conflicts with federal law).

"Most of the preemption cases falling within the conflict category are cases that present the second scenario discussed in Hillsborough County – when 'state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress.'"  Colacicco, 521 F.3d at 266 (quoting Hillsborough County, 471 U.S. at 713); Pennsylvania Employees Ben. Trust Fund, 499 F.3d at 247 (stating that the question presented was whether state consumer fraud laws posed an obstacle to the FDA's congressionally-mandated regulation of prescription drug advertising).  Such "obstacles" are  not just found in state statutes; law suits based on state tort law "may be viewed as presenting obstacles to the federal objectives and hence barred as preempted."

Colacicco, 521 F.3d at 267 (citing Geier, 529 U.S. at 871-72).  This is because, in the absence of this

principle,

> state law could impose legal duties that would conflict directly with federal
> regulatory mandates . . . .  Insofar as petitioners' argument would permit
> common-law actions that "actually conflict" with federal regulations, it would take
> from those who would enforce a federal law the very ability to achieve the law's
> congressionally mandated objectives that the Constitution, through the operation of
> ordinary pre-emption principles, seeks to protect.  To the extent that such an
> interpretation of the saving provision reads into a particular federal law toleration of
> a conflict that those principles would otherwise forbid, it permits that law to defeat
> its own objectives, or potentially, as the Court has put it before, to "'destroy itself.'"

Geier, 529 U.S. at 871-72 (quoting Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 228

(1998)).

In the area of conflict preemption, the Third Circuit has recognized that State common-law

tort actions based on a federally regulated manufacturer's failure to warn can present defendants with

particular difficulties.  This is because State standards of care differ from state to state, and the

absence of any consistent federal warning requirement may subject such manufacturers "to

considerable liability based on varying standards, with no benchmark that they should follow."

Colacicco, 521 F.3d at 267-68.  Thus, Colacicco teaches, in determining whether a federal

regulation, or the failure to regulate as extensively as a plaintiff seeks, has preemptive force, we must

review the record of the agency's treatment of the desired warning at issue.  Id.; accord Hillsborough

County, 471 U.S. at 721 (holding that, in the absence of a clear congressional command as to

preemption, courts may infer that the relevant administrative agency possesses a degree of leeway

to determine which rules, regulations, or other administrative actions will have preemptive effect).

It is in this area that Judge Long's discussion of the FCC's role as sole authority over the licensing

of radio facilities and regulation of the technical aspects of radio communications is relevant and

persuasive.

A.     The Role of the FCC in Regulating Cellular Networks

Congress has given the FCC exclusive authority over every technical aspect of radio communication.  See 47 U.S.C. § 151;[11] Head v. New Mexico Bd. of Exam'rs in Optometry, 374 U.S. 424, 430 n.6 (1963) (holding that the FCC's jurisdiction over technical matters such as frequency allocation is clearly exclusive).  The Supreme Court has held that, in passing the FCA, Congress created a "unified and comprehensive regulatory system" governing the use of radio signals in the United States.  FCC v. Pottsville Broad. Co., 309 U.S. 134, 137 (1940).  Congress has also given the FCC broad authority to issue regulations to implement the FCA, see 47 U.S.C. §§ 154(i), 201(b), 303(r), and the FCC has determined that regulation of the technical standards and competitive market structures for cellular service is within its exclusive regulatory domain.  See In re An Inquiry into the Use of the Bands 825-845 MHZ and 870-890 MHZ for Cellular Commc'ns

---

[11]      "For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the 'Federal Communications Commission', which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter."

47 U.S.C. § 151.

-31-

Sys., 86 F.C.C. 2d 469, ¶ 82 (1981) ("Cellular Commc'ns Sys.").[12]

Further, the Commission has stated that "technical standards and . . . operational rules are to apply nation-wide . . . without regard to state boundaries or varying local jurisdictions," In re An Inquiry into the Future Use of the Frequency Band 806-960 MHZ, 46 F.C.C. 2d 752, ¶ 43 (1974), and declared that its "essential objective" in creating wireless policy is to "achieve nationwide compatibility." Cellular Commc'ns Sys., 86 F.C.C. 2d 469 at ¶ 79. Thus, the FCC has asserted "federal primacy over the areas of technical standards and competitive market structure for cellular service," id. at ¶ 82, and declared that,

> We affirm our preemption over the technical standards for cellular systems. We continue to regard this as being essential to the 'assurance of compatible operation of equipment on both local and national levels.' Order at 505. We have carefully developed the technical requirements essential for efficient spectrum re-use and nationwide compatibility, while providing sufficient flexibility to accommodate new technological innovations. It is imperative that no additional requirements be imposed by the states which could conflict with our standards and frustrate the federal scheme for the provision of nationwide cellular service.

In re An Inquiry Into the Use of the Bands 825-845 MHZ and 870-890 MHZ for Cellular

---

[12]    "In accordance with our authority discussed above, we are asserting federal primacy over the areas of technical standards and competitive market structure for cellular service. Our licensing scheme requires assurance that the 40 MHZ of radio spectrum allocated for cellular service is used effectively and efficiently. The technical standards set forth in this Report and Order are the minimum standards necessary to achieve the desired goals and any state licensing requirements adding to or conflicting with them could frustrate federal policy. Similarly, any state franchising regulations requiring demonstration of a general public need for cellular service could adversely affect our frequency allocation scheme or delay the rapid implementation of cellular service, both of which are central elements of the federal design for cellular operations."

86 F.C.C. 2d 469, ¶ 82

Communications Systems, 89 F.C.C. 2d 58, 95 ¶ 81 (1982).

        B.      The Role of the FCC in Regulating Cellular Phones RF Emissions

      The FCC has also assumed specific responsibility for creating safety standards for cell phone RF emissions (not just cellular infrastructure); however, it has done so not under its authority pursuant to the FCA to regulate the technical aspects of radio communications, but rather under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321-35.[13]   The FCC determined that it had the responsibility under NEPA to address safety concerns raised by RF emissions.  See In re Responsibility of the Fed. Commc'n Comm'n to Consider Biological Effects of Radiofrequency Radiation, 100 F.C.C. 2d 543, ¶ 1 (1985) ("In re Responsibility").  Pursuant to that authority, the FCC evaluated the potential biological effects of FCC-licensed devices and adopted as its standards for RF exposure from wireless service facilities the standards published by the American National Standards Institute ("ANSI").  In re Responsibility, 100 F.C.C. 2d 543, ¶ 24.[14]

---

[13]    "All agencies of the Federal Government shall review their present statutory authority, administrative regulations, and current policies and procedures for the purpose of determining whether there are any deficiencies or inconsistencies therein which prohibit full compliance with the purposes and provisions of this chapter and shall propose to the President not later than July 1, 1971, such measures as may be necessary to bring their authority and policies into conformity with the intent, purposes, and procedures set forth in this chapter."

42 U.S.C. § 4333.

[14]    "We are incorporating by reference into our NEPA rules the guidelines recommended by the American National Standards Institute (ANSI) entitled "American National Standard Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 300 kHz to 100 GHz" (ANSI C95.1-1982). We believe that, for the present, our use of the ANSI guidelines will best implement our statutory obligations under NEPA."

In 1993, the FCC began a rulemaking proceeding to determine whether it should revise its standards in light of new standards issued by ANSI.  In re Guidelines for Evaluating the Envtl. Effects of Radiofrequency Radiation, 11 FCC Rcd. 15123 (1996) ("FCC First Order").  Later, after the passage of § 332(c), the FCC adopted mandatory RF testing, certification, and emission standards for FCC-regulated transmitters, including "[p]ortable devices that operate in the Cellular Radiotelephone Service, [and] the Personal Communications Service" (i.e. cell phones), mandating a maximum "specific absorption rate" (SAR) level of 1.6 W/kg for all cell phones sold in the United States.  47 C.F.R. § 2.1093(c),(d).[15]  Finally, in 1997, the FCC issued In re Procedures for Reviewing Requests for Relief From State and Local Regulations Pursuant to Section 332(C)(7)(B)(V) of the Communications Act of 1934, 13 FCC Rcd. 7268, ¶ 29 (1997) ("FCC Second Order"), in which it reaffirmed the RF exposure limits that it previously adopted for portable and mobile devices.[16]

----

100 F.C.C. 2d 543, ¶ 24 (internal footnote omitted).

> [15]  "The limits to be used for evaluation are based generally on criteria published by the American National Standards Institute (ANSI) for localized specific absorption rate. . . .  SAR is a measure of the rate of energy absorption due to exposure to an RF transmitting source. SAR values have been related to threshold levels for potential biological hazards.  The criteria to be used are specified in paragraphs (d)(1) and (d)(2) of this section and shall apply for portable devices transmitting in the frequency range from 100 kHz to 6 Ghz."

47 C.F.R. §  2.1093(d).

> [16]  "We reaffirm our decision to adopt exposure limits for field strength and power density based on recommendations contained in NCRP Report No. 86 and ANSI/IEEE C95.1-1992.  We continue to believe that these RF exposure limits provide a proper balance between the need to protect the public and workers from exposure to excessive RF electromagnetic fields and the need to allow communications services to readily address growing marketplace demands."

C.      The FCC's Position in RF Exposure Lawsuits

Defendants have appended to their Motion a copy of the *amicus curiae* brief filed by the FCC in the Murray case, in which the FCC took the position that Congress has granted it exclusive regulatory authority to implement cell phone RF exposure limits and has preempted state authority over the subject.  (See Def. Ex. 1 at 12-20.)  In the brief, the FCC argued that Pinney was incorrectly decided and that common law claims alleging injury from RF radiation emitted by cell phones are preempted.[17]

---

13 F.C.C.R. 7268, ¶ 29.

[17]We note that Defendants do not specifically discuss the level of deference we must accord to the agency opinion, an issue that has recently been reexamined by the Supreme Court.

In Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837 (1984), the Court held that we must defer to an agency's regulations interpreting an ambiguous statute, if the statute is one the agency is charged to administer.  Under Chevron, if the statutory language is clear and unambiguous, our inquiry ends and the plain meaning of the statute governs the action.  Id. at 842-43.  If, however, the statutory provision is ambiguous, such ambiguity is viewed as an implicit congressional delegation of authority to an agency, allowing the agency to fill the gap with a reasonable regulation.  Swallows Holding, Ltd. v. C.I.R., 515 F.3d 162, 170 (3d Cir 2008) (citing MCI Telecomm. Corp. v. Bell Atlantic-Pa., 271 F.3d 491, 515-16 (3d Cir. 2001)).

The Supreme Court has clarified the distinction between the level of deference to be accorded *formal* agency regulations and *informal* agency interpretations.  In Christensen v. Harris County, 529 U.S. 576 (2000), the Court explained that informal agency interpretations in "opinion letters and similar documents" are not entitled to Chevron deference.  Id.  Instead, they are "entitled to respect," but only to the extent they have the "power to persuade."  Id. at 587 (citing Skidmore v. Swift & Co., 323 U.S. 134 (1944)); see also Riegel v. Medtronic, Inc., 128 S.Ct. 999, 1010 (2008) (holding that an agency's reading of its own rule is entitled to substantial deference).  The Third Circuit has added that to grant Chevron deference to informal agency interpretations "would unduly validate the results of an informal process."  Madison v. Res. for Human Dev., Inc., 233 F.3d 175, 186 (3d Cir. 2000).

We find that the FCC's amicus brief in Murray is an informal determination entitled only to respect to the extent that it has the power to persuade.  The gist of the brief is an argument to the District of Columbia Superior Court that the Fourth Circuit's opinion in Pinney was wrongly decided.  This is the equivalent of an opinion letter, not a formal regulation.  However, we find that the agency's RF emission standards, and its determination of its own authority to issue them, are formal determinations entitled to Chevron deference.

D.     Defendants' Arguments

Defendants argue, based on this history, that Congress and the FCC have imposed uniform national standards for cell phone RF emissions, and that if Farina is successful with his suit, the resulting judgment would render national uniform standards impossible.  They assert that if a court applying state tort law were to impose different RF emission standards on the industry, nothing would prevent future lawsuits demanding alternative standards in each state.  Permitting local juries to make independent judgments about the "safe" level of RF emissions that should be permitted for cell phones would, they continue, undermine the uniformity that Congress and the FCC have indicated is in the national interest and an essential objective of the comprehensive federal regulatory scheme.  Because carriers have designed their networks to conform with the FCC's RF regulations, Defendants assert that forcing lower RF standards would create gaps in national coverage because the signal from lesser RF emission cell phones would not be able to reach the nearest base station.  For this reason, they conclude that allowing the states to each arrive at their own respective definitions of RF safety would conflict with the federal regulatory scheme, requiring preemption. (Def. Mem. at 22-24.)

E.     Farina's Arguments

Farina, in response, quotes extensively from the Fourth Circuit's opinion in <u>Pinney</u>, which rejected similar arguments.  In its discussion of conflict preemption, the <u>Pinney</u> Court distinguished the FCC's powers to regulate RF emissions under Section 332 from its powers under NEPA:

> We do not infer from § 332 the congressional objective of achieving preemptive national RF radiation standards for wireless telephones.  First, § 332 does not address the subject of wireless telephones, let alone the more specific issue of the permissible amount of RF radiation from wireless telephones.  The FCC's RF radiation standards for wireless telephones were not promulgated pursuant to a mandate contained in §

-36-

332 of the FCA, but rather pursuant to the National Environmental Policy Act's mandate that all agencies assess the environmental impact of their actions. For the FCC, the action was authorizing transmitters that emit RF radiation. In re Guidelines for Evaluating the Envt'l Effects of Radiofrequency Radiation, 11 FCC Rcd. 15123, 15125 (1996). The complete absence of any provision addressing wireless telephones counsels against a finding that § 332 evidences a congressional goal of achieving preemptive national RF radiation standards for wireless telephones.

Pinney 402 F.3d at 457. The Court also mentioned two other factors. First, it noted that Congress, in pursuing its objective of ensuring the availability of a nationwide network of wireless service coverage, was very careful to expressly preempt only certain areas of state law – the regulation of entry and rates and local zoning rules based on environmental factors – while providing that states may still regulate the other terms and conditions of commercial mobile service. The Court called this a "conscious and careful effort to carve out the areas of state laws that it wants to preempt," noting also that Congress specifically allowed for preemptive national RF radiation standards *only* for personal wireless service facilities, not for cell phones. Id. at 458.

Second, the Court relied on the fact that Congress included two savings clauses: a general savings clause that provides that "[n]othing contained in this chapter shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this chapter are in addition to such remedies," 47 U.S.C. § 414; and the specific savings clause of 47 U.S.C. § 332(c)(7), which preempts some of the states' authority to regulate the location of base stations (not wireless telephones), while also providing that the Act "shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided. . . ." These savings clauses, the Court held, "counsel against any broad construction of the goals of § 332 and § 332(c)(7) that would create an implicit conflict with state tort law." Pinney, 402 F.3d at 458.

-37-

F.     Discussion

In its consideration of conflict preemption, we find that <u>Pinney</u> reached the wrong conclusion because its exclusive focus on the language of § 332 was too narrow.  While it appropriately confined its analysis to the language Congress used in § 332 when examining express preemption, implied preemption analysis presumes that Congress has not displaced all state law, and requires that courts examine whether state laws that "fall within the gaps" conflict with the accomplishment and execution of Congress's purposes and objectives.  We see no justification for ignoring the FCC's clear authority under NEPA when analyzing conflict preemption.  Under Supreme Court and Third Circuit case law, we are specifically directed to analyze the agency's discretion in creating its regulations and the comprehensiveness of its treatment of the standards it created to determine whether it intended to establish national uniformity.  <u>See, e.g.</u>, <u>Pennsylvania Employees Ben. Trust Fund</u>, 499 F.3d at 249 ("The degree of discretion inherent in the regulations demonstrates that the FDA envisioned itself occupying an ongoing and extensive role in the supervision of prescription drug advertising."); <u>Hillsborough County</u>, 471 U.S. at 721 (courts may infer that the relevant administrative agency possesses a degree of leeway to determine which rules, regulations, or other administrative actions will have pre-emptive effect); <u>but see</u> <u>Lohr</u>, 518 U.S. at 501 (rejecting an *express* preemption argument regarding common law claims over implantable medical devices because the "generality" of applicable federal labeling and manufacturing requirements distinguished them from cases where "the Federal Government has weighed the competing interests relevant to the particular requirement in question, reached an unambiguous conclusion about how those competing considerations should be resolved in a particular case or set of cases, and implemented that conclusion via a specific mandate on manufacturers or producers").

-38-

In In re Responsibility, the FCC determined that,

> It is our judgment that the Commission is *required* to make a threshold determination as to whether the facilities it approves are "major Federal actions significantly affecting the quality of the human environment," thus triggering environmental review, regardless of whether federal guidelines or standards currently exist for general public exposure to RF radiation.   The Commission cannot avoid its *independent legal obligation under NEPA* to make its own determination as to the environmental impact of its "major actions."   Rather, the Commission *must* comply with its procedural duties under NEPA "to the fullest extent, unless there is a clear conflict of statutory authority."

(Id., 100 F.C.C. 2d 543, ¶ 8 (emphasis added; footnotes omitted).   Speaking in such compulsory terms, the FCC clearly envisioned that there was no discretion inherent in its mandate, demonstrating that it "envisioned itself occupying" the type of "ongoing and extensive role" described in Pennsylvania Employees Ben. Trust Fund, 499 F.3d at 249, in determining RF emission standards.[18] This mandatory rulemaking process resulted in codification of the FCC's regulations governing RF radiation exposure for portable devices.   See 47 C.F.R. § 2.1093.

We find that our resolution of the conflict preemption issue is governed by Geier, Colacicco and Pennsylvania Employees Ben. Trust Fund.   We also find that the comprehensiveness of the federal regulatory scheme here, and the FCC's own determination that its RF emission standards are preemptive, distinguishes this case from the situation of Lohr.[19]   In Geier, the Supreme Court held

---

[18]In addressing the proper standards to apply, the FCC went on to state "in the face of the Commission's acknowledged statutory *obligation* under NEPA," it was required to determine whether it could "rely on existing exposure guidelines in view of the lack of federal standards."   In re Responsibility, 100 F.C.C. 2d 543, ¶ 22 (emphasis added).

[19]The nature and formality of the process and comprehensiveness of the federal regulatory scheme here also distinguishes this case from Fellner v. Tri-Union Seafoods, L.L.C., ___ F.3d ___, 2008 WL 3842925 (3d Cir. Aug. 19, 2008).   Fellner sued Tri-Union, seeking damages for injuries she suffered as a result of the consumption of methylmercury contained in Tri-Union's tuna fish products.   Id. at *1.   She brought a claim against Tri-Union "under the New Jersey Products Liability Act, N.J.S.A. 2A:58C-1, et seq. . . ., based on Tri-Union's failure to warn of the risks incurred in

that plaintiff's argument that her car was defective because it lacked air bags was preempted by federal regulations that specifically permitted automakers to choose among different kinds of passive restraint systems – regulations with which her automobile complied.  The Court found that preemption principles apply to a state-law tort action where the standard of care was in conflict with a federal objective.  Id., 529 U.S. at 871-72.  The majority stated that in the absence of such a principle,

> state law could impose legal duties that would conflict directly with federal regulatory mandates, say, by premising liability upon the presence of the very windshield retention requirements that federal law requires.  See, e.g., 49 CFR § 571.212 (1999).  Insofar as petitioners' argument would permit common-law actions that "actually conflict" with federal regulations, it would take from those who would enforce a federal law the very ability to achieve the law's congressionally mandated objectives that the Constitution, through the operation of ordinary pre-emption principles, seeks to protect.  To the extent that such an interpretation of the saving provision reads into a particular federal law toleration of a conflict that those principles would otherwise forbid, it permits that law to defeat its own objectives, or potentially, as the Court has put it before, to "'destroy itself.'"

Id. (quoting Am. Tel. & Tel. Co. v. Cent. Office Tel., Inc., 524 U.S. 214, 228 (1998)).

Similarly, in Colacicco, a case involving the lack of a warning on pharmaceutical labels, the

---

consuming its products." Id. at *2.  The district court dismissed her suit, finding that Fellner's claims were preempted by the Food and Drug Administration's ("FDA") "regulatory approach" to the risk of mercury in tuna.  Id. The Third Circuit reversed, finding that the FDA had "taken no regulatory action which preempts Fellner's lawsuit."  Id. at *1.  As it noted, the FDA had "promulgated no pertinent legal standard pertaining either to the risks posed by mercury in fish or to warnings for that risk" and had not "otherwise acted on the issue in a manner that could be deemed an exclusive application of federal law."  Id. at *10.  The Third Circuit further noted that "a mere decision not to regulate," specifically the FDA's decision not to require "a federal methylmercury warning" did not, by itself, preempt state law.  Id. at *12.  In contrast, in the instant case, the FCC has done much more than merely decided not to require a warning; it has expressly evaluated the potential biological effects of FCC-licensed devices and adopted specific standards for RF exposure.  In re Responsibility, 100 F.C.C. 2d 543, ¶ 24.  Moreover, as we discussed in Section 3.B., the FCC has engaged in rule-making with respect to RF testing, certification and emissions standards for FCC-regulated transmitters, including cell phones.  47 C.F.R. § 2.1093(c), (d); FCC Second Order ¶ 29.  We find, accordingly, that Fellner does not control our decision in this case.

Third Circuit determined that,

> State common-law tort actions based on the manufacturers' failure to warn present
> the pharmaceutical manufacturers with particular difficulties.  State standards of care
> undoubtedly differ from state to state.   Absent a determination that the
> FDA-approved labeling and the FDA's refusal to require the warnings suggested by
> plaintiffs in this case preempt state tort actions, the manufacturers may be subjected
> to considerable liability based on varying standards, with no benchmark that they
> should follow.

521 F.3d at 267-68.   After reviewing the FDA's drug labeling regulations, the Court stated that

> In this case we need not speculate on the rationale of the FDA for its failure to
> require the adult suicidality warnings.  Not only has the FDA filed an amicus brief
> in the Colacicco action but it has repeatedly rejected the scientific basis for the
> warnings that Colacicco and McNellis argue should have been included in the
> labeling.  The FDA has actively monitored the possible association between SSRIs
> and suicide for nearly twenty years, and has concluded that the suicide warnings
> desired by plaintiffs are without scientific basis and would therefore be false and
> misleading.

Id. at 269 (footnote omitted).

In Pennsylvania Employees Ben. Trust Fund, the Third Circuit refused to permit claims based

on state consumer fraud laws that conflicted with federal drug labeling and advertising requirements,

holding:

> Implied conflict preemption of state consumer fraud laws is required in this setting
> because both the FDCA and FDA regulations provide specific requirements for
> prescription drug advertising.  Congress specifically determined that "all . . .
> proceedings for the enforcement, or to restrain violations, of [the FDCA] shall be by
> and in the name of the United States."  21 U.S.C. § 337(a).  The high level of
> specificity in federal law and regulations with respect to prescription drug advertising
> is irreconcilable with general state laws that purport to govern all types of
> advertising.

499 F.3d at 251-52.

In contrast, the concern raised by Lohr – a case dealing only with express preemption –

involved asserted preemption in an area where the federal government had treated the subject matter

-41-

only generally.  The <u>Lohr</u> Court found that state law negligence and strict liability claims involving

an allegedly defective heart pacemaker were not preempted by the express preemption language of

the Medical Devices Amendment Act of 1976, 21 U.S.C. § 360k(a),[20] or FDA regulations

promulgated thereunder, which imposed any "requirement" different from or in addition to federal

law.  The Court rejected the manufacturer's argument that any common-law cause of action was a

"requirement" which altered incentives and imposes duties "different from, or in addition to," the

generic federal standards that the FDA  promulgated in response to mandates under the MDA.  The

Court held:

> Medtronic's argument is not only unpersuasive, it is implausible.  Under Medtronic's
> view of the statute, Congress effectively precluded state courts from affording state
> consumers any protection from injuries resulting from a defective medical device.
> Moreover, because there is no explicit private cause of action against manufacturers
> contained in the MDA, and no suggestion that the Act created an implied private
> right of action, Congress would have barred most, if not all, relief for persons injured
> by defective medical devices.  Medtronic's construction of § 360k would therefore
> have the perverse effect of granting complete immunity from design defect liability
> to an entire industry that, in the judgment of Congress, needed more stringent
> regulation in order "to provide for the safety and effectiveness of medical devices

---

[20]"State and local requirements respecting devices
>     (a) General rule
>>         Except as provided in subsection (b) of this section,
>>         no State or political subdivision of a State may
>>         establish or continue in effect with respect to a device
>>         intended for human use any requirement-
>>>             (1) which is different from, or in
>>>             addition to, any requirement
>>>             applicable under this chapter to the
>>>             device, and
>>>             (2) which relates to the safety or
>>>             effectiveness of the device or to any
>>>             other matter included in a requirement
>>>             applicable to the device under this
>>>             chapter."

21 U.S.C. § 360k(a)

intended for human use," 90 Stat. 539 (preamble to Act).  It is, to say the least, "difficult to believe that Congress would, without comment, remove all means of judicial recourse for those injured by illegal conduct," Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L.Ed.2d 443 (1984), and it would take language much plainer than the text of § 360k to convince us that Congress intended that result.

Lohr, 518 U.S. at 487.

Here, the FCC recognized its mandatory obligation to issue RF emission standards for cell phones, and provided specific requirements for cell phone RF emissions through its adoption of the revised ANSI SAR maximum.  Like the Third Circuit in Colacicco, we do not need to speculate on the FCC's rationale for adopting the revised ANSI standards for RF emissions from cell phones.  The agency's rulemaking decisions set forth its understanding of its authority, its rationale for adopting the original and revised ANSI standards, and, later, for finding no basis to alter them.

Farina's allegations unquestionably trample upon the FCC's authority to determine the maximum standard for RF emissions.  This is clear from the facts that Farina admits that FCC-issued licenses determine the specifications for cell phones sold by each provider, and that he seeks to hold the manufacturers and providers liable even though he does not allege that they failed to meet the required FCC standard.  This is no different from the claim rejected by the Supreme Court in Geier. That plaintiff sought to hold the car manufacturer liable for failing to install airbags when Congress permitted the manufacturer the option – with which the manufacturer complied – to install seatbelts instead.

Farina claims entitlement to relief because Defendants knew or should have known of the biological risks associated with cell phone use and the associated RF exposure, knew or should have known of the decrease in biological risk associated with a greater distance between the cell phone

and the user and that properly designed headsets would increase this distance, and despite this knowledge, sold cell phones without headsets. In order to win a jury verdict on these claims, Farina necessarily has to ask a jury to accept his premise that the FCC's SAR maximum is inadequate to ensure the safe use of cell phones and, thus, headsets are required in order to make them safe. Thus, he seeks to impose legal duties that would conflict directly with federal regulatory mandates because the Defendants could be held liable even though they indisputably complied with the SAR maximum. Under Supreme Court and Third Circuit case law, he is barred from doing so.

## V.    CONCLUSION

For the reasons we have articulated, the motion of Cellular One Group to dismiss for want of personal jurisdiction is granted. The Defendants' joint motion, as well as the motion of LG Electronics, based on federal preemption principles is also granted. Because these motions resolve all of Farina's claims, Defendants' motions based on state law are dismissed as moot.

An appropriate order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

FRANCIS J. FARINA                :          CIVIL ACTION
                                 :
            v.                   :
                                 :
NOKIA, ET AL.                    :          NO.  06-724

## ORDER

**AND NOW**, this 2nd day of September, 2008, **IT IS HEREBY ORDERED** as follows:

1.      Defendant LG Electronics MobileComm U.S.A., Inc.'s Motion for Judgment on the Pleadings for Failure to State a Claim under Pennsylvania Law (Docket Entry 103) is **DISMISSED AS MOOT**.

2.      Defendant Cellular One Group's Motion to Dismiss Francis J. Farina's Third Amended Complaint for Lack of Personal Jurisdiction (Docket Entry 104) is **GRANTED**.

3.      Defendant LG Electronics MobileComm U.S.A., Inc.'s Motion for Judgment on the Pleadings Dismissing Plaintiff's Complaint as Preempted under Federal Law (Docket Entry 105) is **GRANTED.**

4.      Defendants' Joint Motion to Dismiss Plaintiff's Third Amended Complaint for Failure to State a Claim under Pennsylvania Law (Docket Entry 106) is **DISMISSED AS MOOT**.

5.      Defendants' Joint Motion to Dismiss Plaintiff's Third Amended Complaint as Preempted under Federal Law is **GRANTED**.

6.      Judgment is **ENTERED** in favor of all Defendants and against Plaintiff Francis J. Farina.

The Clerk of Court is **DIRECTED** to mark this case closed.

BY THE COURT:

S/John R. Padova

_____

John R. Padova, J.